UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

WAUKESHA FLORAL & GREENHOUSES, INC.,
d/b/a Waukesha Floral and
Waukesha Floral & Greenhouses,

      Plaintiff,                                   Case No.:     15-C-01365

v.

JAMES POSSI,
YOUR FLORIST, LLC,
and ANN M. RICE,

      Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## **INTRODUCTION**

       The Plaintiff, Waukesha Floral & Greenhouses, Inc. (hereinafter "Waukesha Floral") has brought claims for trademark Infringement, unfair competition, and deceptive trade practices against all Defendants, James Possi, Your Florist, LLC, and Ann Rice. The Defendants assert that the Plaintiff is unable to prove that it suffered any damages from the conduct it attributes to the Defendants, and that certain claims of the Plaintiff are precluded by the doctrine of laches and by the expiration of controlling statutes of limitation. The Defendants also assert that the Plaintiff has completely failed to allege and support any claims that can survive summary judgment as against Ann Rice, who is both an employee of the Defendant's business and the daughter of James Possi.

With respect to its claims against the Defendants, James Possi and Your Florist, LLC, the Plaintiff's entire damage claim rests solely on the opinions of the Plaintiff's accounting expert, Curtis Reynolds. However, Mr. Reynolds was unable to testify to a reasonable degree of accounting certainty that his calculations of the Plaintiff's supposed damages were anything other than speculation. Therefore, Mr. Reynolds' testimony must be excluded, and the Plaintiff's claim regarding actual damages dismissed as a matter of law.

The Plaintiff is wholly unable to identify a single customer, job, assignment, sale, relationship or deal that it lost due to the conduct it alleges against the Defendants. Under oath, the Plaintiff's designated representatives conceded that any claim for itemized damages rests solely upon the testimony of Mr. Reynolds. Since Mr. Reynolds' opinion, by his own admission, does not rise above speculation, the Plaintiff is unable to establish any damages attributable to its claims of unfair competition, breach of a settlement agreement or Wis. Stat. § 100.18.

In addition, to the extent that the Plaintiff applies to this court for the only remedy it might otherwise have—sanctions under the Langham Act—the court will see that the circumstances of the relationship between the parties dictate that no such relief is equitable. The discovery in this case has shown that every maneuver that the Plaintiff attributes to the Defendants in the marketing and listing of its business was applied in virtually equal measure by the Plaintiff against the Defendants. Thus, application for recourse under the Langham Act is unavailable to the Plaintiff because its hands are unclean.

Finally, the Defendants will show that most, if not all, of the Plaintiff's claims should be dismissed under the defense of laches and/or the expiration of controlling statutes of limitations.

Furthermore, the Plaintiff does not contend that Defendant, Ann Rice, violated any federal or state law. The Plaintiff is unable to produce any evidence that would allow the

Plaintiff to pierce the corporate veil and find that by working for her father, Ann Rice is somehow individually liable for trademark infringement.

There is no evidence to conclude that Ms. Rice was contributorily liable for direct trademark infringement, because there is no evidence that Ms. Rice acted outside the scope of her employment and individually committed the tortious act of trademark infringement. The last two claims the Plaintiff is bringing against Ms. Rice are for unfair competition and deceptive trade practices; however, once again, the Plaintiff has not provided, nor can it provide, any evidence to support those claims against Ms. Rice. The Plaintiff's claims against Ann Rice must be summarily dismissed as a matter of law.

## BACKGROUND

The Plaintiff, Waukesha Floral & Greenhouses, is suing Your Florist, LLC, James Possi, and Ann M. Rice for trademark/tradename infringement, unfair competition, and deceptive trade practice. (Defendants' Proposed Material Facts (hereinafter "DPMF") ¶ 1; Dkt. # 1-1.) It is also suing James Possi for violation of the 2000 stipulation and order for dismissal. (Dkt. # 1-1)

Ann M. Rice is the daughter of James Possi, and a former employee of her father's shop, Best Floral, which is located at 918 East Moreland Boulevard, Waukesha, WI. (DPMF ¶ 2, 4, 7, 8.) Ms. Rice has never had any ownership interest in the business named Best Floral. (*Id.* ¶ 6.) Before 2011, Ms. Rice worked at Best Floral with her father for a couple of years. (*Id.* ¶ 7.) In 2011, Mr. Possi wanted to open another shop, and asked Ms. Rice to work alone at Best Floral. (*Id.* ¶ 10.) Ms. Rice worked alone at Best Floral for less than two years, before she told her father that she could not work there anymore, because it was too time-consuming. (*Id.* ¶ 11, 12.)

While working at the flower shop, Ms. Rice ran the daily operations, such as paying bills, answering the phone, opening and closing the shop, and making deliveries. (*Id.* ¶ 13, 14, 15, 16.)

3

However, Ms. Rice did not place advertisements for the business. (*Id.* ¶ 18.) Nor did she direct anyone or any company to place advertisements for the business. (*Id.* ¶ 19.) Further, she never request that additional telephone numbers for additional business names feed calls to Best Floral. (*Id.* ¶ 20.) Moreover, there is no evidence to suggest that Ms. Rice individually took out any advertisements or set up or purchased telephone numbers that have been associated with James Possi's businesses. (*Id.* ¶ 21, 22, 23.)

Additionally, the Plaintiff has not named Best Floral as a party to this lawsuit. (*Id.* ¶ 5.) It has however, named Your Florist, LLC—James Possi's business—as a party to this action. (*Id.* ¶ 2.) Ms. Rice is not now nor has she ever been an owner or member of Your Florist, LLC. (Possi Dep. 93:4-8.) James Possi and his wife, Larisa Possi are the only owners/members of Your Florist, LLC. (*Id.* ¶ 24.)

Almost twenty years before the Plaintiff brought this lawsuit, it brought a similar lawsuit against James Possi. In 2000, the Plaintiff and James Possi resolved the earlier lawsuit via a signed settlement agreement. (*Id.* ¶ 25.) Ms. Rice was not a party to either the 2000 lawsuit or the subsequent settlement agreement. (*Id.* ¶ 26.) She was not even aware that there was a previous lawsuit between her father and the Plaintiff. (*Id.* ¶ 27.)

On July 23, 2003, just three years after the settlement agreement was signed, the Plaintiff's former attorney wrote a letter to James Possi stating that he was concerned Mr. Possi was violating the terms of the 2000 settlement agreement and infringing on the Plaintiff's trademark. (*Id.* ¶ 28.) Then two years later in 2005, the Plaintiff again brought up that it believed Mr. Possi was infringing on its trademark. (*Id.* ¶ 29.) Again, other than the letter, the Plaintiff took no further action on its claim of infringement. A year to two years later in late 2006 and early 2007, the Plaintiff's attorney contacted Mr. Possi's attorney to discuss possible

infringement on the part of Mr. Possi.( *Id. ¶* 30.)  However, it was not until 2015 that the Plaintiff brought this lawsuit alleging claims of trademark infringement. (*Id. ¶* 31.)

While the Plaintiff is claiming trademark infringement, it is doing the same exact things that it is accusing the Defendants of doing. In 2007, the Plaintiff's own attorney conducted metadata search and found that the Plaintiff was using the name "Waukesha Florist" – itself an infraction of the terms of the settlement agreement. (*Id. ¶* 32.) Then, in 2015 and 2016, web searches for Defendant's business name "Best Floral" brought up multiple referrals to the Plaintiff's business telephone number. (*Id.* ¶ 33, 34.) Further, as late as November 9, 2017, the Plaintiff's address and telephone number were listed in an online listing for Mr. Possi's business, Best Floral. (*Id.* ¶ 35.)

During the course of this litigation, the Plaintiff identified at least five telephone numbers it alleged were linked by Mr. Possi to business names that it argues infringe upon its trademark. (Dkt. # 90, ¶ 40.)  It was those five business names and numbers that Plaintiff then referred to its accounting experts, Craig Reynolds and Kelly M. Conway, with instructions to create a forensic report itemizing damages claimed to be associated with calls to those five numbers.  (*Id.* ¶ 39.) In the report, Mr. Reynolds assumed a linear, one-to-one correlation between the disputed business names and the five numbers; that is, Mr. Reynolds assumed in his calculations that each call to one of the five numbers was generated by a caller who meant to be calling one of the five disputed business names.  (*Id.* ¶ 41, 42.)  However, Mr. Reynolds was unaware—until his deposition—that there were a dozen or so business names, over a time frame extending beyond a decade, to the five telephone numbers.  (*Id. ¶ 59.*)  It is impossible for Mr. Reynolds to differentiate which calls had been placed to the five telephone numbers by callers responding to

5

one of the disputed business names versus callers responding to one of the dozen "benign" names associated with the same five telephone numbers. (*Id. ¶* 44)

<u>STANDARD OF REVIEW</u>

A court should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Seventh Circuit states that summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a tier of fact to accept its version of events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (*quoting Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005)). And in order to defeat a summary judgment motion, the United States Supreme Court has stated that the non-moving party must provide the Court with sufficient admissible evidence, which would allow a trier of act to find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

If a non-movant party is unable to provide such evidence then, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

<u>ARGUMENT</u>

<u>The Claims Against Ann Rice Must Be Summarily Dismissed</u>

Under Fed. R. Civ. P. 56(a), all of Waukesha Floral's claims against Ms. Rice should be dismissed, because the Plaintiff cannot show that there is a genuine dispute as to any material fact and cannot produce evidence to support its claims against her. Waukesha Floral's first through fifth claims all relate to either federal or common law trademark/tradename

6

infringement. In order to be successful on these claims against Ms. Rice, who is an individual employee of her father's business, the Plaintiff would need evidence to either pierce the corporate veil, show Ms. Rice was individually responsible for contributing to the infringement, or that she herself directly infringed on the Plaintiff's trademark/tradename.

Further, in order for the Plaintiff to prove its claims against Ms. Rice for state law "unfair competition" and "deceptive trade practices," it must show that Ms. Rice fraudulently or intentionally participated in unfair competition or deceptive trade practices. Here, however, the Plaintiff pleads no allegation of such conduct against Ms. Rice, and it has failed to produce any admissible evidence at all to support such claims. It remains unclear why Waukesha Floral even amended its complaint a second time to add Ms. Rice as a party; given the animosity between the parties, though, the amendment was, at best, an error in pleading and, at worst, an intentional effort to harass Mr. Possi and his family. Regardless of the reasons behind the Plaintiff's second amended complaint, it cannot sustain its claims against Ms. Rice; and, therefore, this Court should grant Ms. Rice's motion for summary judgment and dismiss all claims against her.

## I. THE PLAINTIFF CANNOT PROVE ITS FEDERAL TRADEMARK INFRINGEMENT ALLEGATIONS AGAINST MS. RICE AND THEREFORE THE CLAIMS MUST BE DISMISSED.

The Plaintiff's amended complaint contains five specific claims against Ms. Rice regarding trademark/tradename infringement; they are as follows:

(1) *Ms. Rice violated 15 U.S.C §1114*, which states,

> Any person….use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive…shall be liable in a civil action by the registrant for the remedies hereinafter provided.

(2) *Ms. Rice violated 15 U.S.C. § 1125(a)*, which states

7

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which…is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act;

(3) *Ms. Rice violated 15 U.S.C. § 1125(c)*, by diluting the Plaintiff's "famous" mark and as such the Plaintiff is entitled to an injunction against Ms. Rice. This claim for relief also states that the Plaintiff is entitled to the recovery of damages pursuant to 15 U.S.C. § 1117(a);

(4) *Ms. Rice violated common law trademark rights*; and

(5) *Ms. Rice violated tradename infringement rights*.

All of the Plaintiff's Lanham Act claims against Ms. Rice must be summarily dismissed because there is no evidence to support these claims.

A. <u>The Plaintiff's Lanham Act Claims Against Ms. Rice Should be Dismissed Because The Plaintiff Cannot Pierce the Corporate Veil</u>

Although there was a period of time where title *to the property/building* that housed the floral shop business—Best Floral—was in Ann Rice's name, Ms. Rice has never been the owner of Mr. Possi's business. (DPMF ¶ 21.)

The Plaintiff's principal claims against Ms. Rice are its allegations that Ms. Rice owned her father's business, and therefore could and did control all aspects of the business, including advertising under names that allegedly violate the Lanham Act. It is now the "put up or shut up" point of the lawsuit, though, and there exists no proof that Ms. Rice ever was an owner, shareholder, officer, or any other type of business partner at Your Florist, LLC. (*Id*. ¶ 6, 25.)

8

In Mr. Possi's deposition, he states that only his wife, Larisa Possi, and himself, have ever owned Your Florist, LLC. (*Id.*) Ms. Rice testified that, in 2011, her father asked her to help him with the Waukesha shop so that he could open another shop in Milwaukee. (*Id.* ¶ 10.) Both Mr. Possi and Ms. Rice testified that Ms. Rice only helped in the Waukesha shop for less than two years. (*Id.* ¶ 11.) She stated she could not be at the shop enough and therefore told her dad that she had to stop working there. (*Id.* ¶ 12.)

Ms. Rice testified that, while she was working at the Waukesha shop, she ran the shop's daily operations, but her father always owned the shop. (*Id.* ¶ 13.) Ms. Rice's operation of the flower shop included paying bills associated with the upkeep of the shop. (*Id.* ¶ 13.) However, she stated that she has never directed anyone to advertise different names other than Best Floral, nor did she purchase phone number listings under other business names to funnel calls to Best Floral. (*Id.* ¶ 19, 20.)

 Even if Ms. Rice is considered an officer of the business, the corporate veil could not be pierced

"As a general rule, corporate officers are not held personally liable for infringement by their corporation when they are acting within the scope of their duties." *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir.1926); and *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 468 F.2d 225, 233 (7th Cir.1972). A plaintiff seeking to hold an officer personally liable must make a "special showing" that the officer acted "willfully and knowingly," such as by "personally participat[ing] in the manufacture or sale of the infringing article (acts other than as an officer)" or by "[using] the corporation as an instrument to carry out his own willful and deliberate infringements." *Specht v. Google, Inc.,* 660 F. Supp. 2d 858, 864 (N.D. Ill. 2009) (citing *Dangler,* 11 F.2d at 947); see also Papa John's, 446 F.Supp.2d at 805. Specht v. Google, Inc., 660 F. Supp. 2d 858, 864 (N.D. Ill. 2009).

9

The Plaintiff has failed to produce any evidence that Ms. Rice was the owner of the business located in Waukesha from 2011 to 2015. However, even if this Court finds some genuine dispute on Ms. Rice's ownership of a business named Best Floral, the Plaintiff still cannot pierce the corporate veil to hold Ms. Rice personally liable. In order to do so under an alter ego theory of liability test, the Plaintiff must show that (1) the defendant exercised total control over the entity in regard to the act, (2) the control exercised by the defendant was used to commit fraud or some wrong, and (3) there is a causal connection between the first two elements described and that an injury or loss to the plaintiff resulted. *See Consumer's Co-op of Walworth County v. Olsen,* 142 Wis. 2d 465, 484; 419 N.W.2d 211 (1988).

With regards to the first element, Ms. Rice did not exercise control over any of the advertising. (DPFM ¶ 17, 18.) She did not place ads, nor did she ask another company to do so on her behalf. *Id.* What she did for the shop was answer phone calls, pay the necessary bills (like an accountant would do), open and close the store, and make deliveries. (*Id*. 14, 15, 16, 17.) None of these things had anything to do with the trademark infringement that the Plaintiff is claiming.

The second element is also not met, because there is no evidence that Ms. Rice used the shop to commit a fraudulent act. The Plaintiff never makes such an allegation; instead asserting that Ms. Rice was somehow complicit in placing into commerce new names by which the shop sought phone sales. The Plaintiff alleges only that Ms. Rice "took no steps to remove the telephone listings associated with the business at 918 East Moreland Boulevard." (Dkt. 90 ¶ 37.) Now that discovery is completed, though, the Plaintiff has failed to provide any evidence that Ms. Rice even knew about the telephone listings, or would have been able to remove the

telephone listings had she known. Further, Ms. Rice's inaction with regard to the telephone listings does not create a fraudulent act that would allow the Plaintiff to pierce the corporate veil.

If the Court does not dismiss the claims against Ms. Rice, it would be opening the door to allow any employee who works for a company named in an infringement action to be sued for the alleged wrongs of her employer. This would be a slippery slope and could potentially allow plaintiffs to add employees or family members to lawsuits just to harass or coerce the employer dragging his employees or his own family members through years of litigation. Given that the Plaintiff here has failed to provide any evidence that would allow the corporate veil to pierced, this Court should dismiss the claims against Ms. Rice upon their merits.

B. The Plaintiff's Lanham Act Claims Against Ms. Rice Should be Dismissed Because the Plaintiff Cannot Prove Contributory Liability.

Unable to pierce the corporate veil and hold Ann Rice, an employee, liable for the advertising undertaken by her employer, the only other way that the Plaintiff might hold Ms. Rice personally liable for trademark infringement would be under a theory of contributory liability. *Grice Eng'g, Inc. v. JG Innovations, Inc.,* 691 F. Supp. 2d 915, 924 (W.D. Wis. 2010). However, unlike copyright infringement this type of secondary liability for trademark infringement is "more narrowly drawn." *Hard Rock Cafe*, 955 F.2d at 1150. "Personal liability for trademark infringement is established if a corporate officer is 'a moving, active[,] conscious force behind the defendant corporation's infringement.'' *Microsoft Corp. v. V3 Sols., Inc.,* No. 01 C 4693, 2003 WL 22038593, at ¶13 (N.D. Ill. Aug. 28, 2003); *Citing Monsanto Co. v. Haskel Trading, Inc.,* 13 F.Supp.2d 349, 354 (E.D.N.Y.1998); *see also Dynamic Force v. Dynamic Force, Ltd.,* No. 98 C 5922, 1999 WL 342407, at ¶4 (N.D.Ill. May 14, 1999). Further, contributory infringement is established based upon the defendant's intent and knowledge of

another's "wrongful activities." *David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir. 1989); *see also Sealy, Inc. v. Easy Living, Inc.,* 743 F.2d 1378 (9th Cir.1984).

In this case, Ms. Rice did not contract with the "Yellow Pages" to place any advertisements that infringed on the Plaintiff's trademark. (DPMF ¶ 18, 19.) In fact, Ms. Rice did not place any advertisements in the Yellow Pages or Yellow Book at all. (*Id.)* The Plaintiff does not contend that Best Floral is a violation of its trademark.

Moreover, Ms. Rice knew nothing of the earlier settlement agreement between the Plaintiff and Mr. Possi. (She was not a party to the settlement agreement that was signed in 2000; in fact, she would have been about fourteen years old in 2000. (*Id.* ¶ 27.) Ms. Rice only helped manage the Waukesha shop for less than two years.

There is no evidence in this case that Ann was the "moving force" behind the business's advertisements, or any alleged trademark infringement. There is also no evidence to show that Ms. Rice even knew about any alleged infringement upon the Plaintiff's trademark or tradename. Since there is no genuine dispute of a material fact to the contrary, this Court must grant Ms. Rice's Summary Judgment Motion and dismiss all claims against her.

C. <u>The Plaintiff's Lanham Act Claims Against Ms. Rice Must Be Dismissed Because Ms. Rice Did Not Commit A Tortious Act That Infringed Directly Upon The Plaintiff's Trademark.</u>

There is no genuine dispute of fact that Ms. Rice, herself, committed no direct trademark infringement against the Plaintiff. For liability to accrue, an individual must have personally engaged in tortious conduct. *Dangler* 11 F.2d 945, 946 (7th cir. 1926).

The Plaintiff's only substantive allegation against Ann Rice is that she failed to remove decade-old telephone numbers from an outdated phonebook. In the deposition of the Plaintiff's principal, Thomas Loppnow, he asserted that Ms. Rice may be culpable in this lawsuit because

she violated the "stipulation." (DPMF ¶ 22.) The stipulation that Mr. Loppnow is referring to is the settlement agreement signed in 2000 by the Plaintiff, Mr. Possi, and Mr. Possi's business, "Best Florist." (*Id.* ¶ 28.) Upon questioning, though, Mr. Loppnow, conceded that neither Ms. Rice nor the business she operated, "Best Floral," were signatories to that "stipulation." (*Id.* ¶ 29.) In sum, Ms. Rice cannot be held to have violated an agreement to which neither she nor the business she operated were parties.

Finally, there is no evidence that Ms. Rice personally engaged in any tortious acts regarding Plaintiff's trademark. Thomas Loppnow, stated in his deposition that he has no evidence that Ms. Rice took out any advertising, nor that Ms. Rice "individually paid for the numerous telephone numbers that have previously been associated with Possi's businesses." (*Id.* ¶ 23, 24.) The Lanham Act claims against Ms. Rice must be dismissed as a matter of law.

## II. THE PLAINTIFF CANNOT PROVE ITS STATE LAW CLAIMS AGAINST MS. RICE AND THEREFORE THE CLAIMS SHOULD BE DISMISSED.

The Plaintiff's final two claims against Ms. Rice are as follows:

(1) Unfair Competition; and
(2) Violation of Wisconsin's Deceptive Trade Practices Act (Wis. Stat. 100.18)

Both claims require proof of intentional acts on the part of a defendant. There exists no evidence of intentional misconduct on the part of Ann Rice, and the claims must be dismissed.

### A. Ms. Rice Did Not Participate in Unfair Competition and Therefore the Plaintiff's Unfair Competition Claim Against Her Must be Dismissed

Wisconsin's unfair trademark claim is "substantially similar" to that of common law trademark infringement. *First Wis. Nat'l Bank*, 85 Wis. 2d at 60. "The same standards that govern plaintiff's Lanham Act claims govern plaintiff's state trademark and unfair competition claims." *Mide-West Mgmt, Inc. v. Capstar Radio Oper. Co.*, 2004 WL 2535404 at 3 (W.D. Wis.

13

Oct. 21, 2004.). Further the "principles used in both actions are substantially similar." *First Wis.*

*Nat'l Bank* at 60.

Again, Ms. Rice did not personally place the telephone book advertisements about which the Plaintiff complains. (DPMF ¶ 18.) Neither did Ms. Rice pay any other person or company to create the advertisements for any business names. *Id.* ¶ 19.)

B. <u>Ms. Rice Did Not Violate Wis. Stat. §100.18,</u>
<u>Wisconsin's Deceptive Trade Practices Act.</u>

Wis. Stat. § 100.18 states the following:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

The Plaintiff, in its second amended complaint, claims that Ms. Rice intentionally published advertisements in order to create confusion between the two businesses. (Dkt. # 90 ¶ 69.) However, the Plaintiff has failed to provide any evidence in support of its claim. Both Thomas and Martin Loppnow, in their respective depositions, testified that they do not have evidence that shows that Ms. Rice published the referenced advertisements. (DPMF ¶ 23, 24, 25.) Martin Loppnow concedes that he does not know of any evidence, whatsoever, that could prove the Plaintiff's claims against Ms. Rice. (*Id.* ¶ 25.)

14

In Ms. Rice's deposition, she made it clear that she has never placed any advertisements in the phone books. (*Id.* ¶ 18.) She testified that the only thing she did regarding the business' phone number was to pay the telephone bill associated with the business named Best Floral. (*Id.* ¶ 13.)

There exists no evidence that Ann Rice committed any intentional act that would violate the "deceptive trade practice" or "unfair competition" elements Wis. Stat. § 100.18. Those claims, like all the equally unprovable federal claims against Ms. Rice, must be dismissed upon their merits.

### III. SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS AGAINST ALL DEFENDANTS IS REQUIRED BECAUSE THE PLAINTIFF HAS NO VIABLE EVIDENCE THAT IT SUSTAINED DAMAGES.

The Plaintiff's only evidence of damages is the report prepared by its forensic accounting expert, Curt Reynolds. Both principals of the Plaintiff, Martin Loppnow and Thomas Loppnow, testified that they have no evidence of a single customer, job, assignment, sale, relationship or deal that Plaintiff lost due to the conduct it alleges against the Defendants. Instead, each testified that the Plaintiff relies exclusively upon the Reynolds report as its evidence of itemized damages. (*Id.* ¶ 85, 86, 87, 88.) Further, Martin Loppnow testified that he is unaware of any bills, receipts, or paperwork in general that would prove the Plaintiff's damages claim. (*Id.*)

However, after completing his report, Mr. Reynolds was deposed and learned, apparently for the first time, that a fundamental assumption in his conclusions was incorrect. Mr. Reynolds had assumed that each of the five telephone numbers he analyzed for "lost sales calls" was associated with a single corresponding "improper" business name used by the Defendants. (*Id.* ¶ 41, 42.) Mr. Reynolds testified that the one-to-one relationship between "improper business name" and corresponding telephone number was a central premise in his conclusions. (*Id.* ¶ 45.)

15

To the contrary, however, for over a decade the five telephone numbers had actually been associated, simultaneously, with multiple business names – the vast majority of which were not the "improper" business names evaluated by Mr. Reynolds. (*Id.* ¶ 43, 59.) Upon learning that fact, Mr. Reynolds conceded that he has no way to differentiate which calls were placed because of reliance upon an improper business name, and which were placed to contact one of the many other business names associated, simultaneously, with the identical number. (*Id.* ¶ 44.) For that reason, Mr. Reynolds' conclusions are fundamentally unreliable, and his report and testimony must be stricken under the Daubert Standard.

A. <u>The Plaintiff's Expert, Curtis Reynolds, Should Not Be Allowed to Testify And His Expert Report Should be Excluded Under Fed. R. Civ. P. 702 and The Daubert Standard</u>.

According to the Seventh Circuit, Fed. R. Civ. P. 702 and the United States Supreme Court's seminal case of *Daubert v. Merrell Dow Pharms., Inc.,* 113 S. Ct. 2786, 2795, govern the admissibility of expert testimony. *See United States v. Lupton*, 620 F.3d 790, 798 (7th Cir. 2010); *See also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Fed. R. Civ. P. 702 states,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

This rule was further clarified by *Daubert*, where the Court addressed the factors a judge may look at when deciding the admissibility of expert testimony. The Court advised that the factors are a non-exhaustive list. *Daubert* 113 S. Ct. at 2975. Some of the factors a judge may look at are as follows:

1) Whether the theory or technique has been scientifically tested;
2) Whether the theory or technique has been published or subject to peer review;
3) The error rate of a particular technique;
4) The existence and maintenance of standards controlling the technique's operation; and
5) Acceptance of the theory in the scientific community.

*Id*. at 591, 593–94.

The Fed. R. Civ. P. 702 and the Daubert test require a different standard than a Summary Judgment Motion. A Summary Judgment Motion requires a sufficiency standard, which means that as to disputed facts, a court must draw any reasonable inferences in favor of the party opposing summary judgment. *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124, 1130–31 (2d Cir. 1995). It is the movant's burden to demonstrate that there are no genuine issues of material fact or that the Plaintiff cannot produce admissible evidence to support his claims.

However, when a court is considering whether to exclude expert testimony, it must keep in mind that it is "the proponent of the expert that must bear the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 704–05 (7th Cir. 2009) (*citing* Fed. R. Evid. 702 – Adv. Comm. Notes ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence")). It is also the district court that is the gatekeeper, and must make sure that all admitted expert testimony is reliable and relevant. *Stollings v. Ryobi Techs, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). "[T]he key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must 'focus ... solely on principles and methodology, not on the conclusions they generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (*citing Daubert*, 509 U.S. at 595).

Reynolds' Methodology Fails The Reliability Review

17

The Defendants do not argue that Mr. Reynolds is an unqualified Forensic Accountant. Rather, it was Mr. Reynolds' methodology in this case that creates unreliable testimony. In Mr. Reynolds' report, he calculated Plaintiff's damages at $124,973.00. (DPMF ¶ 46.) Mr. Reynolds reviewed voluminous documentation that included a letter from Society of American Florists estimating the average floral transaction value in the Midwest, income tax returns for Waukesha Floral and Greenhouses from 2011 to 2015, inbound calls for Waukesha Floral & Greenhouses from October 20, 2014 to April 4, 2016, inbound calls to five telephone numbers registered by James Possi from January of 2004 to March 8, 2016, and Waukesha Floral and Greenhouse's walk-in vs. phone product analysis annual report for 2006 to 2015. (*Id.* ¶ 47-51.)[1]

Upon that review, Mr. Reynolds' methodology was relatively simple. He counted "the incoming call volume into the [five] telephone numbers improperly used by the defendant and the lost orders and profit resulting from the call." (*Id.* ¶ 52, 53.) The only calls removed from the volume memorialized by AT&T were duplicate entries and calls under ten seconds. (*Id* ¶ 54.) In his report, Mr. Reynolds states that his calculation of total calls is conservative, because he eliminated calls that lasted under ten seconds. (*Id.* ¶ 54.) However, in his calculation, Mr. Reynolds included *unanswered calls.* (*Id.* ¶ 64.)

According to the Society of American Florist (hereinafter "SAF"), the average telephone order transaction is around ten minutes—Mr. Reynolds used the average order amount from SAF, but not the average time to place an order. (*Id.* ¶ 56.) Given the SAF average transactional time per order, Mr. Reynolds assumes that a phone call lasting less than ten seconds could result in an order being placed.

---

[1] While Mr. Reynolds reviewed over 23 separate documents which contained voluminous records, most, if not all of the records cited did not help make Mr. Reynolds' calculation of damages reliable or valid because his methodology itself is unreliable.

18

In the second component of his analysis, Mr. Reynolds estimated the rate at which telephone calls to the Defendants' five phone numbers would generate successful sales by first reviewing the Plaintiff's October 20, 2014 to April 20, 2016, Time Warner Cable reports of incoming calls. (*Id.* ¶ 62.) That number would become the denominator in a success ratio (# of phone sales/ # of calls = success percentage). (*Id.* ¶ 72.) Mr. Reynolds reported that Plaintiff received a total of 24,860 calls, and again he stated that this was a conservative number because it included 7,285 unanswered calls. (*Id.* ¶ 63, 64.) In other words, in Mr. Reynolds' analysis of the ratio between calls and orders, he kept in the formula *unanswered calls.* (*Id.*)

Mr. Reynolds then reviewed two reports, the first one being a "Sales Comparison Analysis" and the second report an order summary of FTD wire orders. (*Id.* ¶ 65.) He deducted the FTD wire orders from the total number of telephone orders (because they were generated by internet and national referrals) during the period of October 20, 2014 to April 20, 2016, and calculated the Plaintiff's total telephone orders during that period at 17,027. (*Id.* ¶ 66, 67.) Mr. Reynolds divided the 17,027 telephone orders received by the Plaintiff, by the 24,860 total calls (answered and unanswered) received by the Plaintiff, for a "success rate" of 68.49%. (*Id.* ¶ 75.)

Mr. Reynolds took his "success rate" of 68.49% and multiplied it by the 5,827 calls that came into the five telephone numbers he assumed were associated strictly with the "improper" business names alleged by Plaintiff, from 2004 through March 8, 2016, and from those numbers, Mr. Reynolds calculated that the Plaintiff lost 3,991 orders. (*Id.* ¶ 77, 78.)

Mr. Reynolds then multiplied the Plaintiff's claimed average per-order sales value by the 3,991 "lost calls," to reach claimed lost gross revenue. (*Id.* ¶ 83.) In his report, Mr. Reynolds states that "as a test of reasonableness, we compared the 2015 average order value results of $66.02 for the Plaintiff to 2016 data provided by the SAF which was $67.73 for florists in the

19

Midwest." (*Id.* ¶ 82.) The final step undertaken by Mr. Reynolds was to deduct operational fixed and variable costs from the gross revenue estimate to reach an "actual" lost profit $124,973.00. (*Id.* ¶ 84.)

There are two fatal flaws in Mr. Reynolds' methodology. First, and dispositive of his conclusions, is the fact that the five telephone numbers used in his calculation were not, as he had assumed, numbers for the individual "improper business names" he examined. Instead, those phone numbers were simultaneously associated with the "improper business names" *and* with several other benign business names. (*Id.* ¶ 43, 59.) Mr. Reynolds conceded that he has no method of saying which, if any, of the 3,991 "lost calls" were actually calls being made to one of the five "improper business names" and which were made to benign business names. (*Id.* ¶ 44.)

Second, Mr. Reynolds' "success rate" contains in its data over 7,000 *unanswered* calls. (*Id.* ¶ 64.) According to the Time Warner record of calls made to the Plaintiff, it received 24,860 phone calls for the time period measured. (*Id.* ¶ 63.) However, the records also confirm that 7,285 of those calls were not answered. (*Id.* ¶ 64.) That leaves, as a matter of fact, only 17,575 calls that could have produced a sale. When the 17,575 calls are compared to the 17,027 phone sales – it produces a purported success rate of 96.88%. (*Id.* ¶ 76.) For Mr. Reynolds' analysis to be truly reliable, unanswered calls would need to be factored out of the calculation, and the result becomes a patently absurd "success rate" of 37 phone calls per day producing 36 sales. (*Id.*)

As the defense forensic accountant wrote: "There must have been calls such as inquiries about prices, available products, orders previously placed, corrections to orders, and questions about bills. There must have been calls from telemarketers, wrong numbers, people returning calls, personal matters, and more. It is simply unreasonable to

believe that all but one phone call per [day] was a new sale." Suggesting that that the Plaintiff only has *one call per day* that doesn't produce a sale is unreasonable "junk science."

<u>Applying the Fed. R. Civ. P. 702 and Daubert Factor Analysis Requires Excluding Mr. Reynolds' Testimony and Report</u>

The Court's gatekeeping function is to "ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999). The gatekeeping function not only allows the court but obligates it to "keep 'junk science' out of the courtroom" *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993).

In this case, the expert is a forensic accountant, and the matter on which his expertise is offered is the calculation of Plaintiff's alleged damages. The Seventh Circuit has stated that when deciding a Daubert issue, the district court must "rule out `subjective belief or unsupported speculation.'" *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 613 (7th Cir. 1993) (*quoting Daubert*, 509 U.S. at 590.)

The court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact at issue. That is, the suggested scientific testimony must `fit' the issue to which the expert is testifying." *Id*. Further, in Daubert the Court stated that, "the ultimate choice of which factors to apply depends upon the nature of the issue, the expert's area of knowledge, and the subject of the testimony." *Id*. So while a trial judge has some flexibility under the Daubert Standard, the standard should not be considered "a free-for-all." *Wilson* 6 F.3d at 1238. The court must be persuaded by the proponent of the expert testimony that the "so-called expert" would be "genuinely helpful to the jury" and can provide

21

reliable knowledge. *Id* The Court in *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898 (7th Cir. 1994), summed up this principle the best by stating, "A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." *Id.* at 901.

Fed. R. Civ. P. 702, requires that "the testimony [be] based on sufficient facts or data." In Mr. Reynolds' expert report, he mistakenly assumed that the five telephone numbers he evaluated were assigned to five, discrete business names. (DPMF ¶ 42.) He believed—incorrectly—that each phone number only matched up with an improper business name and no other names were associated with the phone number. (*Id.*) However, there are many business names beyond the five in dispute that simultaneously had the same phone number listed as its contact. (*Id.* ¶ 43.) Most, but not all, were variations of floral business names not at issue in this lawsuit, but some listings included names that the Defendants have never used before.[2] (*Id.* ¶ 59.)

When Mr. Reynolds was asked whether he could separate the number of calls that were generated by virtue of the "improper names" versus the number of calls that were generated by a benign business name, Mr. Reynolds stated it would be impossible to make that distinction (*Id.* ¶ 44.) Tracy Coenen, the Defendants' accounting expert, opined that no forensic accountant would not be able to determine whether the incoming calls on the examined phone records were the product of the five disputed business names relied on by Mr. Reynolds, as opposed to the various other names associated with the numbers at the exact same time. (*Id.* ¶ 61.) Ms. Coenen opined that it would "therefore [be] impossible to calculate with any certainty the damages incurred

---

[2] Some of the names associated with the telephone numbers that Mr. Reynolds used to calculate the Plaintiff's damages are: Steve D. Rohleder, Michael C. Colllins, Woodwork By Design, LLC, Kalyan Chakravarthy, and Leah Graves.

because of telephone calls to numbers associated with improper business names." (*Id.* ¶ 89.) Given that Mr. Reynolds cannot with any reasonably degree of certainty distinguish between incoming calls directed by proper business names versus improper names, his damages calculations is unreliable as a matter of law.

The second factor establishing that Mr. Reynolds' calculations is legally unreliable is the methodology he employed to determine a success rate to assign the calls generated by the Defendants' phone numbers. As laid out above, the success rate is calculated by dividing a numerator, in this case "the number of telephone orders recognized by Waukesha Floral from October 2014 to April 2016," by a denominator, in this case the total number of incoming calls to Waukesha Floral from the same time period. (*Id.* ¶ 75.)

However, in addition to including unanswered calls in the denominator, Mr. Reynolds left out additional telephone numbers associated with Waukesha Floral that should have been analyzed as part of the total calls. As Mr. Reynolds conceded, it is possible that the additional telephone numbers generated additional phone calls to Waukesha Floral that should have been included in the denominator. (*Id* ¶ 73.) The total orders would have stayed static; but by missing additional telephone numbers for the Plaintiff, the "total calls" received by the Plaintiff becomes fundamentally inaccurate.

The last issue with Mr. Reynolds' calculations is that he assumes a one-to-one ratio between phone calls generated and total number of orders (i.e. – one order per successful phone call). (*Id.* ¶ 79.) However, both of the Loppnows stated in their depositions that there were occasions when one call would generate multiple orders, but Mr. Reynolds was unaware of this fact when doing his calculations. (*Id.* ¶ 8011.) Mr. Reynolds further testified that he could not say to a reasonable degree of accounting certainty that if there was no one-order from one-

successful-call ratio, his success rate would be applicable to any other business, especially when "any call to one of these purportedly bad numbers could have generated multiple orders." (*Id.* ¶ 91.)

The third consideration under Fed. R. Civ. P. 702, is that "the testimony [be] the product of reliable principles and methods." In his deposition, Mr. Reynolds never gave a reason why he chose ten seconds as his cut-off for calculating incoming calls. (DPMF ¶ 92.) And while he uses the Society of American Florists' average amount for an order, he fails to use that source's 10-minute average time for a successful telephone order. (*Id.* ¶ 56.) In Ms. Coenen's expert report, she looks at calls of one minute or more and of ten minutes or more. (*Id.* ¶ 57, 58.) If Mr. Reynolds used one minute or more "the number of phone calls to be included in the damage calculation would be reduced by more than 75 percent." (*Id* ¶ 58.)

Further, if Mr. Reynolds had used the SAF's ten minute rule of thumb, "the number of phone calls to be included in the damage calculation would be reduced by more than 98 percent." (*Id* ¶ 57.) Since Mr. Reynolds, himself, could not explain or give any sort of reasoning for using ten seconds, this alone makes his calculation an unreliable method.

In summary, Mr. Reynolds cannot: (1) testify that the five phone numbers upon which he based his entire damage calculations are fairly assignable to only the Defendants' use of "improper business names;" (2) state with certainty that he included all phone numbers used by the Plaintiff in calculating the total calls the Plaintiff received in the examined time period; (3) give any reason as to why he randomly chose ten seconds as his cut-off number for a successful sales call, or (4) give a reasonable explanation for why he used unanswered calls in a success analysis, the removal of which would lead to an irresponsible calculated success rate of 98.66%, meaning the Plaintiff receives only a single telephone call every day that fails to generate a floral

24

sale. The testimony of Curtis Reynolds is unreliable, unsupported by credible methodology and must be excluded under an evidentiary evaluation.

B. <u>By Excluding Curtis Reynolds' Unreliable Testimony, The Plaintiff's Damages Claim Must Thereafter Be Dismissed In Its Entirety.</u>

In Martin Loppnow's deposition, he testified that besides for Mr. Reynolds' report, he had no other evidence to support a claim for actual damages. (*Id.* ¶ 85.) In Thomas Loppnow's deposition, he also deferred to Mr. Reynolds and his brother Martin in regards to any actual damages that the Plaintiff incurred as a result of the alleged trademark infringement. (*Id*. ¶ 87, 88.) The only evidence of any actual damages that the Plaintiff can point to is the report done by Mr. Reynolds. Once this Court concludes that Mr. Reynolds' testimony is to be excluded, then the Plaintiff cannot prove any claim for actual damages.

IV. **THE PLAINTIFF'S CLAIMS SHOULD BE DISMISSED, AND ITS REQUEST FOR DAMAGES AND EQUITABLE RELIEF SHOULD BE BARRED BECAUSE OF THE AFFIRMATIVE DEFENSES OF UNCLEAN HANDS, LACHES, AND STATUTE OF LIMITATIONS.**

A. The Plaintiff's Claims Should Be Dismissed And Its Request For Statutory Damages And Equitable Relief Should Be Barred Because Its Hands Are Unclean.

It is within a circuit court's discretion to "award the defense of unclean hands." *Timm v. Portage Cnty. Drainage Dist.*, 145 Wis. 2d 743, 752, 429 N.W.2d 512 (Ct. App. 1988). The United States Supreme Court has gone further and stated that, "This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'' *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 815, 65 S. Ct. 993, 997–98, 89 L. Ed. 1381 (1945) (*quoting Keystone Driller Co. v. General Excavator Co*., supra, 290 U.S. 245, 246, 54 S.Ct. 147, 148, 78 L.Ed. 293.). In order for the court to "award the defense of unclean hands" the misconduct does not need to rise to the level of being

25

punishable by law, instead "any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct" will suffice. *Id.* at 998.

Specifically, in "trademark infringement context, the plaintiff's unclean hands can bar equitable relief" *Fabick, Inc. v. FABCO Equip., Inc.,* No. 16-CV-172-WMC, 2017 WL 5186470, at *21 (W.D. Wis. Nov. 8, 2017).

In this case, the evidence shows that the Plaintiff is doing the exact kind of manipulation of trade names and "search engine hits" that it is accusing the Defendants of doing. The Plaintiff is claiming that the Defendants are advertising in the yellow book and yellow pages using names that are similar to that of the Plaintiff's tradename. However, an internet search easily found multiple examples of search results for the Defendants' business name that directed the searching party to the Plaintiff's telephone number. Some as recently as November 9, 2017, where the Plaintiff's address and telephone number shows up under the Defendants' tradename and trademark, Best Floral. (DMPF ¶ 38.)

Another instance of the Plaintiff having "unclean hands" dates back to 2007, when the Plaintiff's own attorney conducted a metadata search and found that the Plaintiff was using the trade name "Waukesha Florist," which was a direct violation of the 2000 settlement agreement. (*Id.* ¶ 35.) Moreover, in March of 2015, using AddUSA.net, a web search for "best floral" produced search results listing the Plaintiff's business contact information. (*Id.* ¶ 36.) Finally, in April of 2016, a google search of "best floral" resulted, yet again, in results that included the Plaintiff's business information. (*Id.* ¶ 37.)

The described misdirection and search engine optimization is the exact same type of consumer manipulation that the Plaintiff is accusing the Defendants of doing. If the type of misdirection employed by the Plaintiff is "fair game," then the Plaintiff enters any dispute over

its use with unclean hands. That conduct, alone, permits this Court to grant the Defendants' summary judgment motion and dismiss all claims against them.

B. The Plaintiff's Claims Against All Defendants Should Be Dismissed Under the Affirmative Defense of Laches

The Seventh Circuit in *Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 792–93, laid out a three-part test to apply the doctrine of laches in a trademark infringement case. First, "the defendant must show that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark." *Id.* Second, the plaintiff must have "inexcusably delayed in taking action with respect to the defendant's use." *Id.* And, third, the defendant must show he "would be prejudiced by allowing the plaintiff to assert its rights at this time." *Id.*

With regards to the first element, the Plaintiff, by its own actions through counsel, concedes that it had actual notice of the Defendants' purported trademark infringement. The Plaintiff was accusing James Possi of tradename infringement as early as 2003—twelve years before it commenced this lawsuit—and yet the Plaintiff did nothing at that time. (DPMF ¶ 31.) On July 23, 2003, the Plaintiff's former attorney wrote a letter to Mr. Possi stating that he was concerned Mr. Possi was violating the terms of the 2000 settlement agreement and infringing on the Plaintiff's trademark. (*Id.*) The response that the Plaintiff received was a letter from Mr. Possi's former attorney, in July of 2003, disputing that Mr. Possi's practices violated the settlement agreement. (*Id.* ¶ 93.) The Plaintiff, having been advised that there was a dispute, chose not to act.

Thomas Loppnow testified that, in 2005, discussions regarding allegations of tradename infringement against Mr. Possi were renewed. (*Id.* ¶ 32.) Then, in late 2006 and 2007, the Plaintiff's former attorney contacted Mr. Possi's former attorney to discuss yet again allegations of infringement on the part of Mr. Possi. (*Id.* ¶ 33.) For almost twelve years, the Plaintiff would

27

sporadically accuse Mr. Possi of trademark and tradename infringement. Thus, the first *Chattanoga Mfg* element cannot be in reasonable dispute.

The second consideration for the court is whether Plaintiff's failure to act on its accusations of trademark infringement for over 12 years was inexcusable; in so doing, the Seventh Circuit has looked to "analogous state statutes of limitations." *Wisconsin Cheese Grp., Inc. v. V & V Supremo Foods, Inc.,* 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008) The Wisconsin State statute that is analogous with the Lanham Act, as cited by the Plaintiff Second Amended Complaint, is Wis. Stat. §100.18(11)(b)(3). This statute was also cited as analogous in *Wis. Cheese Grp.,* 37 F. Supp. 2d at 1000. The limitation on actions under Wis. Stat. §100.18(11)(b)(3) is three years. *Id.* Here, under a comparison to the statute of limitations, the Plaintiff's lawsuit against the Defendants is untimely by over 9 years.

In *Wis. Cheese Grp.* the plaintiff was found to have had actual knowledge of the defendant's alleged trademark infringement for over 14 years. *Id.* at 1001. The court found that the 14-year delay was "nearly five times longer than the state statute of limitations." *Id.* Therefore, the court stated that there was a presumption that the delay was inexcusable. *Id.* In our case, the Plaintiff had actual knowledge, on multiple occasions since 2003, of conduct on the part of the Defendants that it alleges infringed on its tradename and trademark, and yet Plaintiff and sat on its hands for an additional 12 years. The Plaintiff deliberately chose to do nothing until 2015, and the resulting 12-year delay in commencing an action - nearly four times longer than the state statute of limitations – is presumptively inexcusable.

In order to rebut this presumption, the Plaintiff "must offer evidence excusing its delay or demonstrating that the party claiming laches has not suffered prejudice." *A.C. Aukerman Co. v. Miller Formless Co*., 693 F.2d 697, 699 (7th Cir.1982). That will be impossible in this case. The

28

passage of 12 years has seen the effective extinction of the medium – paper phone books – upon which the Plaintiff's allegations of infringement are based. Simply put, the Defendants have almost no opportunity to explore or recreate the state of the advertisement alleged to have been improper. Records have been destroyed or are inaccessible; witnesses employed by the medium are long gone, many of the businesses whose employees could explain the machinations of how placement of telephone listings were to be arranged in paper books no longer exist, and the medium itself has been largely replaced by electronic search methods.

The Seventh Circuit, "previously noted that 'laches is a question of degree' and that "if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice is required."' *Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 795 (7th Cir. 2002)(*quoting Hot Wax,* 191 F.3d at 824.)(*citing Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir.1996)).* The Seventh Circuit Court in *Hot Wax,* found that plaintiff knew about the alleged infringement and sat by idly and did nothing for numerous years. *Hot Wax,* 191 F.3d at 824. This meant that the defendant continued to invest time and money in marketing its products a certain way. *Id.* Therefore, the court concluded that the defendant had been prejudiced as a matter of law. *Id.*

Similarly, in this case, the Plaintiff did nothing for 12 years against Mr. Possi and Your Florist, LLC despite assertions of infringement. (DPMF ¶ 34.) In turn, the Defendants have invested time and money into their business over that period, and have operated with a reasonable assumption that they were properly abiding the terms of both the settlement agreement and the law controlling fair advertising – because the Plaintiff took no action on its allegations to the contrary. Additionally, after sitting on what it claims are its rights for 12 years,

29

the Plaintiff is now trying to claim damages for that twelve-year period. Had the Plaintiff brought a timely claim for infringement back in 2003, the damage period would have only been about a year. The Plaintiff cannot be permitted to do nothing for more than a decade, and then claim a decade's worth of damages. Given these reasons and the significant delay in the bringing the claims, the Court should grant the Defendants motion for Summary Judgment on all of the Plaintiffs claims.

C.   The Plaintiff's Wis. Stat. § 100.18 Claim Should Be Dismissed Because the Claim Was Brought After the Three-Year Statute of Limitation Period.

Under Wis. Stat. § 100.18(11)(b)(3), there is a three-year statute of limitation period. *See also Wis. Cheese Grp.,* 37 F. Supp. 2d at 1000. The statute specifically states, "No action may be commenced under this section more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action." Wis. Stat. § 100.18 (11)(b)(3). The Plaintiff is claiming that since 2004, the Defendants have been participating in deceptive business practices. More specifically, the Plaintiff asserts that the Defendants have not removed telephone numbers it alleges are associated with improper business names. However, the conduct alleged by the Plaintiff occurred more than three years before its 2015 lawsuit. Therefore, the Plaintiff's claims under Wis. Stat. § 100.18 should be barred.

## CONCLUSION

Given the foregoing reasons, the Court should grant the Defendants' Motion for Summary Judgment.

Dated this 28th day of February 2018.

PIPER, SCHMIDT & WIRTH
Attorneys for Defendants


BY: _Electronically signed by Joseph M. Wirth_
    JOSEPH M. WIRTH
    State Bar No.:  1012080

P.O. Address:
4th Floor – The Jackson Building
732 N. Jackson Street
Milwaukee, WI  53202-4620
Telephone:  (414) 225-4060
Fax:  (414) 271-6196
E-mail: jmw@piperschmidt.com