# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

WAUKESHA FLORAL & GREENHOUSES, INC.,
(d/b/a Waukesha Floral and Waukesha Floral & Greenhouse),

    **Plaintiff,**

    **v.**                                     **Case No. 15-CV-1365**

JAMES POSSI, YOUR FLORIST LLC, and
ANN M. RICE,

    **Defendants.**

---

### DECISION AND ORDER ON DEFENDANTS' MOTION
### TO EXCLUDE OPINIONS AND TESTIMONY OF CURTIS REYNOLDS

---

Waukesha Floral & Greenhouses, Inc. sues James Possi, Your Florist LLC, and Ann M. Rice (collectively "the defendants") for trademark infringement, unfair competition, and violation of a 2000 stipulation and order for dismissal between Waukesha Floral and Possi.[1] Before me is defendants' motion to exclude expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The defendants seek to bar the testimony of the plaintiff's damages expert, Curtis Reynolds. (Docket # 187.) For the reasons discussed below, the defendants' motion is granted.

## BACKGROUND

The underlying facts of this case are detailed in the June 1, 2018 decision and order on the parties' cross-motions for summary judgment. (Docket # 181.) Waukesha Floral offers the opinion of Curtis Reynolds, a forensic accountant, as to the damages it allegedly

---

[1] Waukesha Floral also raised claims for tradename infringement and violation of Wis. Stat. § 100.18; however, these claims were dismissed on summary judgment.

sustained from the defendants' improper use of names similar to Waukesha Floral & Greenhouse and the use of telephone numbers associated with those names. (August 18, 2016 Expert Report of Curtis Reynolds ("2016 Report"), Ex. A to Declaration of Joseph M. Wirth ¶ 1, Docket # 154-3.) Reynolds subsequently revised his report and Waukesha Floral now offers Reynolds' report dated March 27, 2018. (March 27, 2018 Expert Report of Curtis Reynolds ("2018 Report"), Ex. F to Declaration of Matthew Fernholz ¶ 6, Docket # 160-6.) The defendants argue Reynolds' second report is impermissible because it remedies defects in the original report rather than supplementing the opinion. (Defs.' Br. at 11, Docket # 188.) The defendants further challenge the methodology for calculating damages used in both of Reynolds' reports, arguing it does not meet the *Daubert* standard.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*. *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The inquiry consists of three general areas: (1) the testimony must be "helpful," which dovetails with the relevance requirements of Fed. R. Evid. 401–403; (2) the expert must be qualified by knowledge, skill, experience, training, or education; and (3) the testimony must

2

be reliable and fit the facts of the case. *Lyman v. St. Jude Medical S.C., Inc.*, 580 F. Supp. 2d 719, 722 (E.D. Wis. 2008).

Whether an expert is qualified to render an opinion must be considered on a question-by-question basis. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citation omitted) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'").

As to reliability, the court examines whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The district court must act as the gatekeeper to ensure that the proffered testimony is both relevant and reliable. *Pansier*, 576 F.3d at 737. To help ensure the reliability of expert testimony, the court considers, for example, whether the theory can be and has been verified by the scientific method through testing, whether the theory has been subjected to peer review, the known or potential rate of error, and the general acceptance of the theory in the scientific community. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996). The court must also ensure that there is a credible link between the evidence and the conclusion of the expert. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Despite the court's role as a gate keeper, expert testimony is liberally admissible under the Federal Rules of Evidence. *Lyman*, 580 F. Supp. 2d at 723. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

3

proof are the traditional and appropriate means of attacking shaky but admissible evidence."
*Daubert*, 509 U.S. at 596.

**REYNOLDS' EXPERT REPORTS**

Although the defendants challenge Waukesha Floral's submission of an updated report, because the defendants' arguments apply to both reports, I need not address whether Waukesha Floral should be permitted to submit a revised report.

Reynolds calculated Waukesha Floral's damages as follows. In the 2016 Report, Reynolds reviewed telephone bills and tallied the incoming calls to telephone numbers alleged to have been improperly used by the defendants. (Docket # 154-3 at 2.) Reynolds removed duplicate entries and all calls under ten seconds. (*Id.*) Reynolds reviewed records from five telephone numbers between January 2004 and March 8, 2016. (Ex. 4 to 2016 Report, Docket # 156-2.)

Reynolds then estimated the success rate of telephone orders in relation to incoming calls as experienced by Waukesha Floral at its own telephone numbers. Reynolds used six telephone numbers from October 20, 2014 to April 20, 2016, as those were the available records. (Docket # 154-3, Docket #156-2.) Reynolds included unanswered calls in this calculation. (Docket # 154-3.)

Reynolds then used two sales reports from Waukesha Floral to calculate the total number of telephone orders achieved by Waukesha Floral from October 20, 2014 to April 20, 2016. (*Id.*) Reynolds then divided the telephone orders received by Waukesha Floral by the total calls (answered and unanswered) received by Waukesha Floral, to achieve a "success rate" of 68.49%. (*Id.*) Reynolds then applied the "success rate" to the total number of incoming calls received on telephone numbers allegedly improperly used by the

4

defendants from January 2004 to March 8, 2016, which resulted in 3,991 lost orders. (*Id.* at 3–4.)

Reynolds then estimated the average sales value per floral order, using data from Waukesha Floral, and then compared that value to 2016 data provided by the Society of American Florists ("SAF"). (*Id.* at 4.) According to the SAF, the average sales value per transaction in 2016 was $67.73 for florists in the Midwest. (*Id.*) Reynolds noted that Waukesha Floral's average sales varied from 2006 to 2015, but generally ranged from $53.00 to $66.00 per transaction. (*Id.*) Reynolds then applied the average sales value per order to the calculated lost orders, by year, to calculate total lost sales. (*Id.*) Finally, Reynolds subtracted the saved cost of goods sold and other variable expenses from the lost sales value to reach a total damage amount of $124,973.00. (*Id.* at 5.)

In the 2018 Report, Reynolds utilized the same methodology for calculating damages; however, he removed the unanswered telephone calls from his calculation of Waukesha Floral's incoming calls. (Docket # 160-6 at 3.) Reynolds also added incoming calls from two additional telephone lines for Waukesha Floral. (*Id.* at 2.) With the alterations in data, the "success rate" changed to 90.98%, the total lost orders increased to 5,302, and the total damages increased to $166,014.00. (*Id.* at 4–5.)

## ANALYSIS

As an initial matter, Waukesha Floral misstates the proper standard for analyzing a *Daubert* challenge. Waukesha Floral argues that in trademark infringement cases, damages are difficult to calculate and involve some degree of speculation. (Pl.'s Br. at 1–2, Docket # 190.) Waukesha Floral further argues that it is not the trademark holder's responsibility to segregate which sales were generated by a defendant's infringement. (*Id.* at 4.) Waukesha

5

Floral has skipped a step. We are not yet at the point of proving damages; we are deciding whether to admit expert testimony. Again, whether an expert's testimony is admissible is governed by Fed. R. Evid. 702 and *Daubert*, and it is the proponent's burden to prove the admissibility of their evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 706 (7th Cir. 2009).

The defendants do not challenge Reynolds' qualifications to render an opinion as to Waukesha Floral's actual damages. Rather, the defendants argue that Reynolds' methodology used in calculating damages is flawed. As outlined above, Reynolds' first step in his damages calculation was to determine the defendants' incoming calls. To do this, Reynolds took the incoming call volume records from AT&T for five telephone numbers associated with business names allegedly improperly used by the defendants. (Docket # 160-6 at 2–3.) Reynolds used data from 2004 through March 8, 2016 (the date the injunction in this case was ordered). (*Id.* at 3.) Reynolds removed telephone calls under ten seconds. (*Id.*) The resulting number of calls was 5,827. (*Id.* at 9.)

The defendants argue Reynolds' methodology in determining the defendants' incoming calls is flawed in two ways. First, they argue Reynolds mistakenly assumed that the five telephone numbers were assigned solely to five discrete business names in dispute when the evidence shows that the defendants simultaneously listed multiple business names in the phone directories for each of the numbers and some listings included names the defendants do not recognize. (Defs.' Br. at 12, Docket # 188.) Thus, it is impossible to separate calls to benign business names from calls to allegedly infringing ones. The defendants further argue that Reynolds' use of ten seconds as the cut-off time for determining the calls included in the defendants' incoming call number is arbitrary.

6

Waukesha Floral argues there are foundation problems with several of the names the defendants argue are associated with the five telephone numbers because the defendants' expert did not perform any independent research and simply looked at the internet. (Pl.'s Br. at 4.) Waukesha Floral further argues that Reynolds simply used telephone numbers the defendants provided in response to discovery requests. (*Id.* at 5.) While it does not seem improper for Reynolds to use the telephone numbers provided to Waukesha Floral in discovery by the defendants, Reynolds' report still has an immediate glaring flaw. In determining the number of telephone calls used in his calculation, Reynolds included telephone numbers associated with business names allegedly infringing Waukesha Floral's trade name "Waukesha Floral & Greenhouse." (Docket # 154-3 at 1, Docket # 160-6 at 2.) Waukesha Floral's causes of action alleging infringement of the trade name "Waukesha Floral & Greenhouse" were dismissed on summary judgment. To be fair, both of Reynolds' reports predate the summary judgment decision and this error could be easily remedied by removing the telephone numbers associated with names allegedly infringing the trade name "Waukesha Floral & Greenhouse" from the analysis and performing the calculations again. Thus, this is a criticism of Reynolds' data, not his methodology.

But Reynolds' use of ten seconds as a cut-off for determining which of the defendants' incoming calls to include in his calculation is problematic. The defendants argue that Reynolds' assumption that calls over ten seconds produce flower sales is completely arbitrary. Beyond stating that the defendants' expert acknowledged that telephone calls lasting between ten and sixty seconds could result in a successful telephone order (Pl.'s Br. at 7), Waukesha Floral does nothing to defend Reynolds' methodology in using the ten second cut-off.

Reynolds testified that the basis for the ten second threshold was "conversations with the plaintiff about what could occur on a phone call, whether it was a consumer inquiring about the hours and when the store might be open, when they could come in for an order, or if they made an inquiry about having product available to come in to purchase later, [ ] that could be done in a short duration." (July 10, 2018 Deposition of Curtis Reynolds at 18, Ex. A to Declaration of Joseph Wirth ¶ 1, Docket # 189-1.) Reynolds further testified that he "may have" done some mock telephone calls with the plaintiff "inquiring about hours and things like that and timed it, and I think that was part of coming up with the ten seconds." (*Id.* at 20-21.)

The reasoning or methodology underlying an expert's testimony must be scientifically valid, ruling out any subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). Reynolds' inclusion of any calls over ten seconds in his calculation is nothing more than speculation. It is unclear why he did not use as the cut-off eleven seconds, one minute, or five minutes. Beyond his assertion that he "may have" done a few test calls with the plaintiff and had some discussions about the type of calls he gets that are "done in a short duration," it appears the choice of ten seconds was indeed arbitrary. Thus, Reynolds' methodology is flawed in this manner.

Reynolds' next step in his calculation was to determine the "success rate." In doing so, Reynolds used data from Waukesha Floral's business records to determine the number of telephone orders it received from October 20, 2014 to April 20, 2016. (Docket # 160-6 at 3.) This number was 17,027. (*Id.* at 11.) Reynolds then reviewed telephone records for incoming, answered calls to telephone numbers associated with Waukesha Floral from October 20, 2014 to April 20, 2016. However, for one of Waukesha Floral's telephone

8

numbers, Reynolds used data from August through December of 2017. (*Id.*) This total was 18,714. (*Id.*) Reynolds then divided the two numbers to get a success rate of 90.98%.

$$\frac{17{,}027}{18{,}714} \text{ x } 100 = 90.98\%$$

Reynolds' next step in the calculation was to determine lost orders. To calculate this, Reynolds took the number of defendants' incoming calls over ten seconds (5,827) from 2004 through March 2016 and multiplied the total calls for each year by the success rate, to get the number of lost orders for that year. (*Id.* at 3–4.) For example, for 2004, the total calls to the defendants' numbers were 31, multiplied by 90.98%, equals 28 lost orders. (*Id.* at 8.) For 2005, the total calls were 20, multiplied by 90.98%, equals 18 lost orders. (*Id.*) Reynolds went on to perform this calculation for each year between 2004 and 2015, and for January 1, 2016 through March 8, 2016. (*Id.*) This resulted in 5,302 lost orders. (*Id.*)

The defendants argue Reynolds' methodology for calculating the success rate is flawed because: (1) Reynolds used incoming calls to Waukesha Floral from October 20, 2014 to April 20, 2016 and included all answered calls; whereas, when he applied the success rate to the defendants' incoming calls, he used incoming calls from January 2004 to March 8, 2016 and only included calls lasting over ten seconds; (2) within Reynolds' data set for Waukesha Floral's answered calls, for one of the telephone numbers, records were only used for a four-month (rather than eighteen-month) period of time between August and December 2017; (3) Reynolds cannot explain what "unanswered call" means; and (4) the success rate is an arbitrary number that has no scientific basis. (Defs.' Br. at 11.)

Waukesha Floral responds to the defendants' criticisms about the data set Reynolds used by stating that the defendants and their expert cannot come up with anything better.

9

(Pl.'s Br. at 9–10.) This is not a contest between experts. The question is whether Reynolds' testimony is reliable. And Reynolds' success rate calculation (and thus his lost orders calculation) is indeed flawed. While I do not find problematic Reynolds' ability to define "unanswered calls" (this seems self-explanatory), Reynolds does not explain why for Waukesha Floral's data set he uses eighteen months and includes all answered calls, no matter the length, and for the defendants' data set he uses twelve years and calls over ten seconds. If Reynolds believes that at least ten seconds is necessary to lead to a flower sale, why does Waukesha Floral get the benefit of the assumption that all calls—even a one second call—must lead to a flower sale? Further, while Waukesha Floral can explain why it only has data for one of its telephone numbers for four months as opposed to eighteen months (i.e., the telephone service provider only kept records going back six months), it fails to explain why this does not affect the reliability of Reynolds' methodology.

The defendants do not challenge the remainder of Reynolds' methodology for calculating damages (i.e., average value of sales, saved cost of goods sold and other variable expenses), but with the first three parts of the analysis so inherently flawed, Reynolds' methodology does not pass muster under *Daubert*. Thus, the defendants' motion to exclude Reynolds' expert testimony is granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendants' motion to exclude expert testimony (Docket # 187) is **GRANTED**.

10

Dated at Milwaukee, Wisconsin this 5th day of November, 2018.

BY THE COURT:

s/Nancy Joseph
NANCY JOSEPH
United States Magistrate Judge